UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

ERIC ADAMS,

Petitioner,

vs.

FRED FOULK, Acting Warden,[1]

Respondent.

Case No: C 10-5642 SBA

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

On April 10, 2006, Petitioner was found guilty by a Santa Clara County jury of four counts of making a criminal threat, two counts of attempting to dissuade a witness from testifying by threat of force, one count of unlawfully causing a fire to an inhabited structure, two counts of conspiracy to dissuade a witness from testifying, one count of misdemeanor battery, and one count of misdemeanor brandishing a weapon. Cal. Pen. Code §§ 422, 1361.1, 182, 452, 242, 417; Resp't Ex. A3 – Clerk's Transcript ("CT") 623-638, 645. Petitioner Eric Adams has now filed a pro se Petition for Writ of Habeas Corpus ("Petition"), pursuant to 28 U.S.C. § 2254, to challenge his conviction and sentence. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES the Petition for the reasons set forth below.

[1] Fred Foulk, the current acting warden of the prison where Petitioner is incarcerated, has been substituted as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

# I. BACKGROUND

## A. STATEMENT OF FACTS

Petitioner and his brother/codefendant, Jesse Adams ("Jesse"), were charged in connection with the underlying incident, and were tried together in the Santa Clara County Superior Court.[2] The following factual summary is taken from the California Court of Appeal's unpublished opinion affirming Petitioner's judgment and sentence:

> Counts 11 through 15, which charged Eric Adams with criminal threats, battery, and brandishing, arose out of events on August 23, 2004. Christopher Huber and Rolando Gonzalez were trimming trees at the home of Huber's brother-in-law Justin Perez and his family. The house was on a corner lot in San Jose. Huber was up in a tree and Gonzalez was gathering branches below.
>
> A young woman ran up to Gonzalez screaming, "Help me. He's gonna kill me." A white car skidded to a stop and Eric Adams got out. The woman, Shante Adams, Eric's wife, was hysterical and her shirt was covered with blood. She got behind Gonzalez and held him in front of her as Eric tried to reach around him. Eric yelled, "Bitch, I'm gonna kill you. Get back in the car. You know you're gonna get these people hurt." Gonzalez testified that Shante was "embracing" him from behind as Eric pushed him by the shoulders and tried to grab Shante. Eric said, "Why are you protecting her? Do you want to fight?" Eric yelled, "I'm gonna kill you, bitch. You better not protect her. You're gonna – you're gonna get hurt protecting this worthless bitch."
>
> Huber started to lower himself from the tree. Eric said, "I'm gonna get you. You're gonna get hurt. You know, I see you, tree man. I'm gonna kill you, tree man." When Eric "gave up trying to get at the lady" through Gonzalez, he started to leave and said, "You ever heard of the Seven Trees?" Huber and Gonzalez understood this to be some kind of gang reference.
>
> Eric left in the white car. Perez and his family tended to Shante's injury in their garage. A few minutes later Eric pulled up, got out of the car, and told Gonzalez, "I told you I was going to kill you." He said something about pistols or guns. Eric went to the trunk of the car, opened it, and reached inside.

---

[2] Jesse also filed a federal habeas action challenging his 2006 conviction of one count of attempting to dissuade a witness from testifying by threat of force, one count of making a criminal threat, and one count of conspiracy to dissuade a witness from testifying. See Case No. 10-0369 LHK (PR). Jesse raised the similar claims of instructional error and insufficiency of the evidence as Petitioner has raised in the instant action. Dkt. 1 in Case No. 10-0369 LHK (PR). On December 16, 2011, the Honorable Lucy H. Koh denied habeas relief in Jesse's case. Dkt. 9 in Case No. 10-0369 LHK (PR).

Eric pulled out what Gonzalez thought was a shotgun. Gonzalez ran and hid behind a tree. Eric was holding something covered with a black jacket. It turned out to be a two-by-four. He held it "in the manner of a pistol."

Huber testified that Eric held the two-by-four like a baseball bat and advanced toward them saying, "You're gonna get this family hurt. This bitch isn't worth protecting. We're gonna come back for you. You're making a big mistake." . . . Eric said, "You've never heard of the Seven Trees." He said to Shante, "I'm gonna kill you, bitch. I'm gonna kill you." He pointed at Huber and said, "All you people are gonna get fucked up." Eric said to Justin Perez, "You're gonna get your family hurt. We'll get you. She's not worth protecting."

. . .

When Eric left, Huber drove to the corner with Gonzalez and watched the house from a distance for "security." Huber "wanted to see it coming or if it happened again, [he] wanted to be able to follow him or something." The police arrived about five minutes after Eric left and interviewed Huber, Gonzalez, Perez, and Perez's wife.

. . .

Counts 1, 2, 3, and 4 arose from telephone contact with Huber. As a result of the August 2004 incident, Eric was placed in custody for a parole violation. Huber, Gonzalez, and Perez testified at an administrative hearing in late 2004. Criminal charges were filed against Eric, and Huber testified at the preliminary examination for those charges in December 2004.

On March 22, 2005, while Eric remained in custody pending trial on criminal threats charges, his brother Jesse Adams was paroled from prison, where he had been for over 14 years. Eric called Jesse and Shante numerous times from the jail. Later that month, Huber received a hang-up phone call. According to Huber's caller ID, the call was from "Leonard Hodge" with a phone number of 270-7483. Although Huber did not know anyone by that name, he tried calling the number back and it was busy for about half an hour. Huber received another call, and the caller ID said "number blocked." Huber testified that when he picked up the phone he "got threatened." In a 45-second call, a man's voice, which was "pretty distinctive" and sounded "like a Mike Tyson impersonation," addressed him by name. The man said, "People that talk, wind up in graves." The man said, "You got a nice house, nice kids. You don't want to lose them . . . Do the right thing. You don't want to wind up dead." Huber understood that by "talk" the voice meant "testify . . . in relation to the case against Eric Adams." Although he took this as a threat to his safety and that of Justin Perez and his family, he did not immediately report this call to the police because he "thought it was all B.S." However, the next day he called the Leonard Hodge number and the person who had threatened him answered the phone. The telephone

number was that of Leonard Hodge, appellants' uncle, with whom Jesse was living. Eric Adams and Jesse Adams were charged with attempting to dissuade a witness by threat of force, making a criminal threat, and conspiracy to commit witness intimidation in counts 1, 3, and 4. Eric was charged in count 2 with attempting to dissuade a witness while having a prior conviction for witness dissuasion.

Counts 5 through 10 charged unlawfully causing a fire to an inhabited dwelling, attempting to dissuade a witness by threat of force in violation of Penal Code section 136.1, and conspiracy to violate section 136.1. About a week after receiving the threatening phone call, Huber arrived home at the end of the day and his grandfather told him that someone had just rung the doorbell. Huber went out and looked around, but did not see anything. On April 3, 2005, Justin Perez called Huber, sounding nervous and shaken, and told Huber that "a bomb went off on his porch." Perez asked Huber to come over and he did so. Huber described the scene at the Perez home. He testified, "The front door was all burnt. There was black soot up all the walls. . . . [T]he doormat was burnt. All the plants were burnt; the smell of gas." The responding San Jose police officer found a lighter and a rolled-up newspaper that smelled of gas on the front porch near the front door of the Perez home. On the walkway leading to the front porch the officer found a small plastic container commonly used to store gasoline. An arson investigator who testified as an expert witness determined that the fire had been set deliberately using gasoline as an accelerant and a lighted, rolled-up newspaper to ignite it.

The fire at the Perez home prompted Huber, fearing for his safety and that of his family, to report the threatening phone call that he had received to the police. A few days later, Huber was called to the San Jose Police Department. Parole Agent Joseph Montiel and another officer played a tape recording for him. Huber recognized the voice on the tape and was positive that it was the same one that he had heard during the threatening phone call. The voice on the tape was that of Jesse Adams. A few weeks later, a detective played three more tape recordings for Huber. Again, Huber recognized the voice that he had heard during the threatening phone call. Again, the voice was that of Jesse Adams. The voices that Huber did not recognize were those of Leonard Hodge and his son.

At the time of the firebombing Perez told an officer that when he was trying to put out the fire, he saw a white, older model, American-made sedan, possibly a Cadillac with tinted windows and lowered body, driving slowly past his house. He told the officer that "it was the same type of vehicle" that he had seen Eric driving at the time of the August 2004 threats. On April 20, 2005, the police seized and impounded Shante Adam's white car, which Eric had been driving on August 23, 2004. The car was registered to Shante Adams and was parked in front of her house. Detective Fischer of the San Jose Police Department testified that when the car was opened up at the

impound yard he could smell a "faint smell of gasoline" inside the car.

. . .

In support of the conspiracy charges, the prosecution introduced evidence concerning phone calls made by Eric, while he was in custody in the Santa Clara county jail, to Shante and Jesse. All inmate telephone calls are recorded and stored, including information about the date and time of the call and the number called. Eric called Jesse several times between March 22 and April 11, 2005. He also called Shante numerous times between March 23 and April 22, 2005. Compact discs of some of these telephone calls, and transcripts of the calls, were introduced into evidence.

Agent Joseph Montiel, a parole agent with the California Department of Corrections and Rehabilitation, testified as "an expert in the area of interpreting street lingo or jail lingo." He said that when Eric discussed his pending case with Jesse and Shante in these conversations, he did not "always speak in a normal, clear manner that you would expect from people in normal, everyday life." He said Eric used "ambiguous ways of phrasing things" and "code words."

Montiel testified that he had listened to a phone conversation between Eric and Shante that took place the night of March 21. In this conversation, Eric referred to "the German" and "the Mexican dude," and Montiel testified that Eric, by saying that one "ain't shit," meant that one was "not too strong." Eric referred to "the homeowner" and Montiel testified that Eric said, "at first he thought he wasn't shit but then after thinking about it, then he thought that he was a threat."

On March 23, Jesse told Eric that "the situation" was going to proceed by Shante taking him to "where it's located." Jesse was going to "talk about family life" with someone. Eric and Jesse expressed concern that the "motherfuckers" might "peep" or "squeal" on Jesse in which case Jesse would be "in the same position" as Eric. Eric said that he "was going to whoop [Shante's] motherfucking ass" and that "these motherfuckers stepped in [his] business." . . .

. . .

Montiel testified that in another March 23 conversation, Eric called Shante and said that he was "fighting for his life" and that he wanted her to "take his boy to go holler at someone." On March 27, Eric called Shante and told her "you're going to drive him there." He said, "You ain't just going to set my boy up, you know? . . . Cause you're the reason, remember that." Eric reminded Shante, "I'm in jail because of you." His tone was generally threatening and abusive. . . .

> On March 29, 2005, Eric called Jesse and Jesse asked him if he "got the kite" that he had "blasted" to him. Jesse told Eric that there was something that he wanted to tell him but that he "can't talk about." Eric told him, "You got to speak on it cleverly, you know?" Jesse referred to "rat head" and said "I did it. . . . It was on a different way . . . Switcherella, you know what I'm talking about?" Montiel testified that Jesse told Eric that "something would happen by the weekend." When Eric asked what would happen, Jesse told him it would be "like Pac does, real thug shit." Montiel explained that "Pac" was a reference to "Tupac Shakur, who was a rapper who rapped about guns, violence, gangs, being a thug, [and] had 'thug life' tattooed on his stomach."
>
> On the evening of April 2, 2005, the day before the Perez house was firebombed, Eric called Jesse and Jesse told him "tonight's the night." Montiel testified that the same evening Eric called Shante, who told Eric that "things were ready" and "it's all gravy." On April 4, 2005, someone called "Johnny" phoned Shante from the jail and asked her "what's up with the kid's folks." Shante said, "everything is good." Johnny asked her, "When is the last time you've seen them?" and Shante answered, "yesterday."
>
> . . .
>
> In his testimony, Eric denied that he conspired to dissuade witnesses. He explained that when he said that the "Mexican dude isn't too strong" he may have "been talking about wrestling, sports, ice hockey." Most of his conversations with Jesse were about Jesse trying to find work and that Eric wanted Shante to drive Jesse to places to help him with this. Some of his conversations were about Eric's dissatisfaction with his public defender and his plans to retain private counsel. . . .
>
> Jesse testified and denied making the threatening phone call to Huber or being involved in the firebombing of the Perez home. . . . He denied speaking in code to Eric and said that in their phone conversations they discussed how he could go about getting a job and Eric's problems with Shante. Jesse said that Tupac Shakur was "a poet" and that a "thug" is "a person that came from nothing . . . trying to raise from poverty . . . and trying to do it his way, trying to make it."

Adams, 2008 WL 2115357, at *1-6 (footnotes omitted).

### A. CASE HISTORY

On April 10, 2006, Petitioner was found guilty by a jury on all charges. He admitted to the following: a prior strike; a prior serious felony conviction; and two prior prison terms for witness intimidation and possession for sale of cocaine. Resp't Ex. B17 - Reporter's

Transcript ("RT") 4819-4820. On July 28, 2006, Petitioner was sentenced to state prison for twenty-four years. Resp't Ex. B20 - RT 5706-5710.

Petitioner filed a direct appeal with the California Court of Appeal, see Resp't Ex. C1, which, on May 20, 2008, affirmed his judgment in a reasoned opinion, People v. Eric Adams, No. H030529, 2008 WL 2115357 (Cal. Ct. App. May 20, 2008) (unpublished opinion); Resp't Ex. C5. On September 10, 2008, the Supreme Court of California summarily denied review. Resp't Ex. D3.

Petitioner has now filed a pro habeas petition which raises claims based on instructional error and insufficiency of the evidence. These claims were raised on direct appeal and there is no issue regarding exhaustion. The matter has been fully briefed and is now ripe for adjudication.

## II. LEGAL STANDARD

To obtain federal habeas relief, a petitioner who challenges a state court judgment must show that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Habeas relief is warranted only if the constitutional error at issue is structural error or had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795-96 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)); Murray v. Schriro, — F.3d —, —, 2014 WL 998019, at *32 (9th Cir. Mar. 17, 2014).[3]

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court cannot grant habeas relief with respect to any claim adjudicated on the merits in a state court proceeding unless the proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

[3] Cases of structural error, which requires automatic reversal, are "rare." Washington v. Recuenco, 548 U.S. 212, 218 n.2 (2006) (listing instances of structural error as the complete denial of counsel, trial judge bias, racial discrimination in selection of grand jury, denial of self-representation at trial, denial of a public trial, and a defective reasonable-doubt instruction).

A state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (internal quotation marks omitted).

Relief under the "unreasonable application" clause is appropriate "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. Habeas petitioners bear the burden of showing that a state court's decision applied some Supreme Court precedent in an objectively unreasonable manner. Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam).

In determining whether a state court's decision is contrary to, or involves an unreasonable application of, clearly established federal law, this Court reviews the "last reasoned decision" by the highest state court to address the merits of the petitioner's claim. See Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). In this case, the last state court opinion to address the merits of Petitioner's claims is the reasoned opinion of the California Court of Appeal.

## III. DISCUSSION

### A. INSTRUCTIONAL ERROR

Petitioner contends that the trial court violated his constitutional rights when it incorrectly instructed the jury on the elements of attempting to dissuade a witness from testifying by threat of force under California Penal Code § 136.1. In particular, Petitioner was charged with violating California Penal Code § 136.1(c)(1)—the knowing and malicious use of force or threat of force to prevent or dissuade any witness from testifying. Id. The correct jury instruction for this offense is CALCRIM No. 2622. At trial, however, the court gave CALCRIM No. 2620, which is the instruction for a violation of California

Penal Code § 137—attempting by force or threat of force to induce another to withhold true testimony. Id.

Petitioner argues that CALCRIM No. 2620 failed to provide the correct intent and malice elements of the crime with which he was charged. Id.; Traverse at 5-9. Petitioner asserts here, as he did on direct appeal, that this amounts to "structural error" and that his conviction for this offense should be immediately vacated. Traverse at 4-6; Adams, 2008 WL 2115357, at *6.

**1. State Appellate Court Opinion**

The Court of Appeal summarized the facts relevant to Petitioner's instructional error claim, as follows:

> Penal Code section 136.1, subdivision (c)(1), is violated by one who "knowingly and maliciously" attempts "to prevent or dissuade any witness or victim from attending or giving testimony at any trial . . . [w]here the act is accompanied by force or by an express or implied threat of force or violence, upon a witness or victim or any third person. . . ." Penal Code section 137 is violated by one who "attempts by force or threat of force . . . to induce any person to give false testimony or withhold true testimony . . . from a law enforcement official." Eric Adams points out, "Sections 136.1 and 137 are directed at different goals, the former at preventing testimony at all and the latter at influencing whatever testimony is given. (People v. Womack, 40 Cal. App. 4th 926, 931 (1995)). Further, unlike section 136.1, section 137 does not require a 'malicious' mental state on the part of the accused."
>
> Using the language of CALCRIM No. 2620, the trial court told the jury, "This next instruction relates to dissuading witnesses. [¶] Defendants Eric Adams and Jesse Adams are charged in Count 1, and defendant Eric Adams is charged in Count 6, with using force or threatening to use force against a person to cause that person to give false testimony or information or withhold true testimony or information. [¶] This instruction I am now reading is also for your consideration of the definitions and elements of the target crimes within the conspiracy charges found in Counts 4, 7, and 10. [¶] To prove the defendant guilty of the crime charged in Count 1, the People must prove: One, the defendant or person for whose actions the defendant is liable . . . used force or threatened to use force against Christopher Huber; and, two, when the defendant . . . used force or made the threat, he intended to cause Christopher Huber to give false testimony or withhold true testimony."
>
> CALCRIM No. 2622 provides, "To prove that the defendant is guilty of [a violation of Penal Code section 136.1], the People must prove that: (1) The defendant maliciously tried to prevent

or discourage the witness from attending or giving testimony at trial, and . . . (3) The defendant knew he was trying to prevent or discourage the witness from attending or giving testimony at trial and intended to do so." It further provides, "A person acts maliciously when he or she unlawfully intends to annoy, harm, or injure someone else in any way, or intends to interfere in any way with the orderly administration of justice." The instruction defines a "witness" and states, "It is not a defense that the defendant was not successful in preventing or discouraging the witness. It is not a defense that no one was actually physically injured or otherwise intimidated."

Eric Adams argues, "Because it described a different offense from that charged against either defendant, CALCRIM 2620 did not provide the jurors any guidance regarding the offense they were charged with adjudicating. The jurors were erroneously told that all they needed to find in order to (a) convict appellants on Counts 1 and 6, and (b) find the necessary criminal objective to the conspiracies alleged in Counts 4 and 10, was that appellant (or his co-conspirator) knowingly 'used force or threatened to use force against' Huber and Perez, in order to cause either of those witnesses to 'give false testimony or withhold testimony.' . . . <u>The instruction did not require the jurors to find that appellant specifically intended to dissuade Huber or Perez from giving any testimony at all or that his intent must have been malicious</u>. Further, it permitted the jurors to find appellant guilty based on an erroneous legal theory that knowingly seeking to induce false testimony constituted a violation of subdivisions (a) and (c) of Penal Code section 136.1."

Respondent argues that "the correct instructions were given and the issues resolved against appellants under those completely unobjectionable instructions. At most, an ambiguity was created, which, in context, was resolved." For this argument, respondent relies on the fact that the trial court did instruct with CALCRIM No. 2622, which defines a violation of section 136.1, at one point during the instructions, and that the trial court instructed the jury to "Pay careful attention to all of these instructions and consider them together" and that "Some of these instructions may not apply."

The court did give CALCRIM No. 2622, the proper instruction when a violation of section 136.1 is charged, in instructing the jury on count 2, which charged Eric with a violation of section 136.1, subdivision (c)(2), for the telephone call Huber received at the end of March 2005. Count 2 of the information charged that Eric had committed "the crime of dissuading or attempting to dissuade a witness/prior conviction for same" in that Eric "did knowingly and maliciously prevent and dissuade and attempt to prevent and dissuade a witness and victim, Christopher Huber, from attending and giving testimony at a trial" and had previously been convicted of a violation of Penal Code section 136.1. In instructing on this count, the trial court defined the intent for "intimidating a witness" as to "maliciously tr[y] to prevent or discourage [the witness] from

> attending or giving testimony at trial." The trial court also defined "maliciously."

Adams, 2008 WL 2115357, at *7-8.

The Court of Appeal rejected respondent's argument that the jury "would have used CALCRIM No. 2622 to cure the mis[-]instruction as to the other counts." Id. at *8. The court was not convinced that the jury "would have taken an instruction that it was specifically told applied only to count 2 and used it to define the elements of other crimes charged that it was specifically told were 'different' than count 2." Id. In addition, the court determined there was "no reason to believe that the jury used the instruction for count 2 for a purpose other than that for which it was given." Id. Nevertheless, the court ultimately rejected Petitioner's claim that the instructional error qualifies as a "structural error" and found that harmless error analysis was appropriate. The court explained:

> Both the United States and California Supreme Courts have clearly stated that the failure to instruct a jury on the statutory elements of an offense is a trial error subject to harmless error analysis. (Neder v. United States, (1999) 527 U.S. 1, 7-15; People v. Flood, (1998) 18 Cal. 4th 470, 492-503). . . . [W]e believe that the omission of statutory elements of an offense, whether of one or multiple elements, is fundamentally a trial error and differs markedly from the limited class of constitutional errors that defy harmless error analysis. Adams, 2008 WL 2115357, at *9.

The state appellate court then analyzed prejudice under the harmless error standard set forth in Chapman v. California, 386 U.S. 18, 24 (1967), which requires affirming the verdict despite the error if, but only if, it appears beyond a reasonable doubt that the error did not contribute to the verdict. In other words, the error is harmless if the jury could not rationally have found that the elements of the charged offense were unproven. Adams, 2008 WL 2115357, at *8. The state appellate court found the error harmless because the evidentiary record showed that the elements omitted from the instruction were, in fact, proven:

In our review of the record, we find no evidence that would support a factual theory under which the omitted elements were not proven. The information described a violation of section 136.1 as "dissuading or attempting to dissuade a witness by use of force or threat of force" by one who "did knowingly and maliciously prevent and dissuade and attempt to prevent and dissuade a witness and victim . . . from attending and giving testimony at a trial, proceeding and inquiry authorized by law, where such act was accompanied by an express and implied threat of force and violence upon the person and property of a witness, a victim and any third person." Counsel for Jesse, perhaps reading from this, told the jury that Jesse was charged "in Count 1 of dissuading or attempting to dissuade by use of force or threat of force, violation of Section 136.1 (c)(1), a felony, did knowingly, maliciously prevent and dissuade or attempt to prevent and dissuade a witness and victim Christopher Huber from attending and giving testimony at a trial. [¶] Now, the common thread to Jesse Adams, of course, is this alleged Huber phone call. That is what you're going to have to decide whether or not legitimately, Jesse Adams made that phone call or someone else did." Counsel referred to the conspiracy charge as "the biggy," and said "certainly dissuading a witness or threatening a witness are not legal" but argued that the jury had to determine "whether or not we have an agreement between Jesse Adams and Eric Adams to dissuade the witness." Counsel referred to the instructions concerning circumstantial evidence, and the jury's obligation to accept any reasonable interpretation that is favorable to a defendant, and argued that the jail recordings could be reasonable interpreted as conversations about Eric encouraging Jesse in his efforts to obtain a job. Counsel argued that the portions of the jail phone recordings relied upon by the prosecution did not support the conspiracy charge because the prosecution "selected them out of [the recordings] and then gave them chosen meanings and Mr. Montiel would then confirm whatever [the prosecutor] asked him." He said, "I beg you not to take anything out of context but to look at it together and see what the meaning of the--what the meaning of the whole tape recording is."

Counsel for Eric Adams argued that, after the firebombing, the police, realizing that Eric was in custody and could not have committed the firebombing personally, decided that "maybe somebody assisted him. So let's go through all the phone calls that Mr. Adams has made out, 20 or so phone calls to his brother, probably 100 calls to his wife during that time, and out of it they start drawing words. One word from here, one word from there, maybe a couple here. And they start interpreting that he's involved in some kind of conspiracy. Let's charge conspiracy in every possible way. Aiding and abetting. Some jury is going to see this thing because he had a prior record. They're going to believe, yeah, he's involved in a conspiracy."

As respondent argues, "To the extent the challenged instructions directed the jury to focus on whether appellants' intent was to 'cause that person to give false testimony or information or withhold true testimony or information,' rather

> than to prevent or discourage that person from attending or giving testimony at trial, it was an uncontested issue. The fine shades of meaning between these two intents was not an issue. Any juror instructed under either CALCRIM Nos. 2620 or 2622 on these facts would necessarily find that the threats were issued to affect the outcome of the trial and whether an acquittal for lack of evidence might be accomplished by completely discouraging a witness's attendance or by causing a witness, although in attendance, to withhold testimony seems a distinction without a difference." This trial fully litigated the central issue of who made the threats to the witness, and there is nothing in the record to suggest that any threat was made with an intent inconsistent with a violation of section 136.1 or was not malicious. Accordingly, any error in instructing the jury with CALCRIM No. 2620 was harmless beyond a reasonable doubt.

Adams, 2008 WL 2115357, at *10-11 (emphasis added).

**2. Federal Authority**

A challenge to jury instructions generally does not state a federal constitutional claim. Estelle v. McGuire, 502 U.S. 62, 72 (1991). To obtain federal habeas relief based on instructional error, the petitioner must demonstrate "that an erroneous instruction so infected the entire trial that the resulting conviction violates due process." Id. In making its determination, the Court must evaluate the challenged jury instructions "in the context of the overall charge to the jury as a component of the entire trial process." Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)).

A determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a manner that violates the Constitution establishes only that an error has occurred. See Calderon v. Coleman, 525 U.S. 141, 146 (1998). Even if an erroneous jury instruction is found to be unconstitutional, habeas relief is unavailable unless the error had a substantial and injurious effect or influence in determining the jury's verdict. Brecht, 507 U.S. at 637; see also Neder v. United States, 527 U.S. 1, 15 (1999) (finding than a jury instruction omitting an element of the crime is subject to harmless-error analysis).

The omission of an instruction is less likely to be prejudicial than a misstatement of the law. See Walker v. Endell, 850 F.2d at 475-76 (citing Henderson v. Kibbe, 431 U.S. at 155). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson v. Kibbe, 431 U.S. 145, 155 (1977)). Petitioner's already heavy burden is even heavier because he failed to object to the jury instructions at trial. See Henderson, 431 U.S. at 154 ("[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court").

**3. Analysis**

The state appellate court found, and Respondent does not dispute, that the trial court gave an erroneous instruction. However, as that court correctly found, such error was not a "structural error" requiring immediate reversal of Petitioner's conviction. United States Supreme Court authority clearly holds that a reviewing court must apply a harmless error analysis to determine if any instructional error was prejudicial. See Calderon, 525 U.S. at 146-47; Neder, 527 U.S. at 15.[4]

At trial, ample evidence was presented to support a jury finding that Petitioner knowingly and maliciously tried to prevent or discourage witnesses from attending or giving testimony at trial by use of force or threat of force, in violation of Penal Code § 136.1. Although Petitioner was in custody when the threatening phone calls to Huber were made and the firebombing of the Perez home occurred, he was charged with California Penal Code § 136.1 as a co-conspirator of Jesse and Shante. The prosecution presented evidence of the threatening phone calls Jesse made to Huber, the firebombing of

[4] On direct appeal, the Court of Appeal found that the erroneous jury instruction was harmless in light of the evidence presented under Chapman's "beyond a reasonable doubt" standard. Adams, 2008 WL 2115357, at *11. In a federal habeas proceeding, however, the Court applies Brecht's less stringent harmless error standard, which looks to whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 637-38. Under a harmless error analysis, the underlying judgment withstands scrutiny under AEDPA.

the Perez home, the numerous phone calls between Petitioner and Jesse, and the expert witness's testimony interpreting the street and jail vernacular used in the calls. As the state appellate court reasonably found, the aforementioned evidence showed that the intent of Petitioner's threats was to affect the outcome of the trial in his favor. As such, it was inapposite whether this was accomplished by causing witnesses to give false testimony pursuant to CALCRIM No. 2620 or by completely discouraging witnesses from attending trial pursuant to CALCRIM No. 2622.

Equally without merit is Petitioner's argument regarding the failure to instruct on malice. CALCRIM No. 2622, the proper instruction for California Penal Code § 136.1, states that "[a] person acts maliciously when he or she unlawfully intends to annoy, harm, or injure someone else in any way or intends to interfere in any way with the orderly administration of justice." As discussed, Petitioner was convicted under § 136.1 based on his conspiracy with Jesse to dissuade witnesses from testifying. The jury heard evidence that Jesse made the threatening phone calls to Huber, and that Petitioner, Jesse, and Shante engineered the firebombing of the Perez residence. The threatening phone calls to Huber and the firebombing were linked to Petitioner through his phone calls to Jesse and Shante. Based on such evidence, there is a reasonable probability that the jury would have found that Petitioner and his co-conspirators acted maliciously with the intent of dissuading them from testifying at trial. Given this evidence, the omission of the intent and malice elements in the jury instruction did not have a substantial injurious effect on the jury's verdict to warrant federal habeas relief. See Brecht, 507 U.S. at 637; Calderon, 525 U.S. at 146-47.

In sum, the Court finds that the state appellate court's rejection of Petitioner's claim relating to the erroneous jury instruction was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent or an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d)(1). Petitioner's request for habeas relief on this claim is DENIED.

**B. INSUFFICIENCY OF EVIDENCE**

In his remaining claim, Petitioner argues that his right to due process was violated on the grounds that there was insufficient evidence to support the conviction for making criminal threats. Specifically, Petitioner argues that his conviction of making criminal threats under California Penal Code § 422 must be reversed because it is unsupported by sufficient evidence showing that Huber and Perez suffered "sustained fear," an element of that offense. The state appellate court explained the elements of the offense at issue, as follows:

> Under Penal Code § 422, a threat to commit a crime that will result in death or great bodily injury to another person is a criminal threat if, "on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety."
>
> The requirement of section 422 that the threat must cause the victim "reasonably to be in sustained fear for his or her own safety" "has a subjective and objective component. A victim must actually be in sustained fear, and the sustained fear must also be reasonable under the circumstances." (In re Ricky T., (2001) 87 Cal. App. 4th 1132, 1140). There is no precise definition of or limitation on the amount of time a victim must experience fear in order to satisfy this element of section 422. However, "sustained fear" has been described as "a period of time that extends beyond what is momentary, fleeting, or transitory." (People v. Allen (1995) 33 Cal. App. 4th 1149, 1156).
>
> Threats are judged in their context and not solely on the specific words that were spoken. "[A]ll of the circumstances can and should be considered in determining whether a terrorist threat has been made." (People v. Solis, (2001) 90 Cal. App. 4th 1002, 1014). "A communication that is ambiguous on its face may nonetheless be found to be a criminal threat if the surrounding circumstances clarify the communication's meaning. [Citation.]" (In re George T (2004) 33 Cal. 4th 620, 635). Although nonverbal conduct alone is insufficient, a combination of words and gestures may constitute a terrorist threat under section 422. (People v. Franz (2001) 88 Cal. App. 4th 1426, 1442-1446).

Adams, 2008 WL 2115357, at *13-14.

**1. Federal Authority**

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). "[E]vidence is sufficient to support a conviction if, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Coleman v. Johnson, — U.S. —, —, 132 S.Ct. 2060, 2064 (2012) quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318). Stated another way, "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, — U.S. —, —, 132 S.Ct. 2, 4 (2011).

In conducting federal habeas review of a claim of insufficient evidence, "all evidence must be considered in the light most favorable to the prosecution." Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir.2011). Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995). A federal habeas petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In order to grant relief, the district court must find that the decision of the state court rejecting an insufficiency of the evidence claim reflected an objectively unreasonable application of Jackson and Winship to the facts of the case. Ngo, 651 F.3d at 1115. When a federal habeas court assesses a sufficiency of the evidence challenge to a state court conviction under AEDPA, "there is a double dose of deference that can rarely be surmounted." Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011).

**2. Analysis of Claim Regarding Huber**

Petitioner contends that his conviction under California Penal Code § 422 must be vacated because insufficient evidence supported the jury's finding that Huber experienced sustained fear as a result of Jesse's phone calls to him between March 29 and March 31, 2005. Pet. 6-7.

The state appellate court then rejected Petitioner's claim as follows:

> The voice that called Huber near the end of March said, "People that talk, wind up in graves." The man said, "You got a nice house, nice kids. You don't want to lose them . . . . Do the right thing. You don't want to wind up dead." Huber understood that by "talk" the caller meant "testify." When asked if he took this call as a threat to his safety, he answered, "Absolutely." Huber said that he considered the call a threat to his safety, that of his family, and that of Justin Perez and his family. However, he testified that he did not immediately report this call to the police "[b]ecause until what happened later, I just thought it was all B.S." He said, "I didn't give it much merit until the firebombing." When the Perez home was firebombed, Huber told the police about the call. Huber testified that he felt fear for his safety and that of his family and that, as of the time of his testimony at trial, he was still in fear for his safety, that of his family, and that of the Perez family. . . .
>
> Appellant Eric Adams argues that "the fear engendered was not due to the statement, but due to the conduct . . . though later conduct may inform whether the declarant intended a statement to be a threat at the time it was made (People v. Solis (2001) 90 Cal. App. 4th 1002, 1013-1014), such later conduct cannot instill retroactive fear." Respondent argues, "It may have taken the firebombing of the Perez house to trigger Huber's report to police that he, too, had been the object of continued terrorism related to his witnessing of the events of August 23, 2004, but that delay neither invalidates his testimony that he was frightened by the telephone call, nor renders his fear unreasonable."
>
> People v. Solis considered whether a threat that may not initially create sustained fear but does so when the threat is followed by subsequent action qualifies under section 422. In Solis, the defendant left a series of messages on his ex-girlfriend's answering machine threatening that he was driving to her home to set fire to it and to kill her. (Solis, 90 Cal. App. 4th 1002, 1009.) The court held that the defendant's conduct after the verbal statement -- setting fire to the ex-girlfriend's apartment building using an accelerant thrown through the ex-girlfriend's bedroom window -- could be considered in determining whether a criminal threat was made. The court stated, "[I]t is clear a jury can properly consider a later action

> taken by a defendant in evaluating whether the crime of making a terrorist threat has been committed . . . . The point is that all of the circumstances can and should be considered in determining whether a terrorist threat has been made. It therefore follows that the court, in response to the jury's questions, properly informed the jury that the threatening statement does not have to be the sole cause of the victim's fear and that a statement the victim does not initially consider a threat can later be seen that way based upon a subsequent action taken by a defendant." (Id. at 1014.)
>
> There is no question that the words used during the telephone call here qualified as a threat. The surrounding circumstances support that view and the language of the threat makes clear that it was intended as such, conveying a gravity of purpose and an immediate prospect of execution. Although Huber did not report it to the police until after the firebombing, he did testify that he was placed in fear at the time he received the threat. He thought enough of it to try calling the Leonard Hodge number that had called him earlier, and found the voice that eventually answered at that number to be the same one that had issued the threat. However, even if Huber's fear did not fully ripen until the firebombing of the Perez home, it was the phone threat which caused him to be in fear for his own safety and that of his family. That fear continued as of the time he testified at trial. The duration of Huber's fear from the point at which he understood, because of appellants' subsequent action, that the threat which had been conveyed to him was not "all B.S.," until he testified at trial supports the element that Huber experienced sustained fear.

Adams, 2008 WL 2115357, at *16-17 (emphasis added).

The state appellate court held that California case law clearly provides that "[t]he phrase to 'cause[ ] that person reasonably to be in sustained fear for his or her own safety' has a subjective and an objective component" and that a "victim must actually be in sustained fear, and the sustained fear must also be reasonable under the circumstances." See id. at *13 (quoting In re Ricky T., 87 Cal. App. 4th at 1140.) The court also noted that "'sustained fear' has been described as 'a period of time that extends beyond what is momentary, fleeting, or transitory.'" Id. at *13 (quoting Allen, 33 Cal. App. 4th at 1156). A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction is binding on federal habeas review. Bradshaw v. Richey, 546 U.S. 74, 76 (2005); Hicks v. Feiock, 485 U.S. 624, 629 (1988). The state's highest court is the final authority on the law of that state. Sandstrom v. Montana, 442 U.S. 510, 516-17

(1979). Even a determination of state law made by an intermediate appellate court must be followed and may not be "'disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" Hicks, 485 U.S. at 630 n.3 (quoting West v. Am. Tel. & Tel. Co., 311 U.S. 223, 237-38 (1940)).

Under California law, all circumstances are considered in determining whether a terrorist threat has been made, including action taken after the threat was made. As the Court of Appeal found and the record shows, sufficient evidence was elicited to establish that Huber had sustained fear from the threatening phone call. Huber testified that, after receiving a few hang up phone calls, he received a phone call that caused him to immediately "[get] threatened]." Resp't Ex. B8 at 2153. Huber took the caller's statement to be a threat to his safety and believed that the threat was made to convince him not to testify in the case against Petitioner. Id. at 2153-54. Huber also believed that Perez's family might be in danger. Id. at 2155. Although Huber initially believed that this call was "B.S.," after the firebombing of the Perez home, he realized it was serious and called the police. Id. at 2155-56. Huber testified that after the firebomb, because of the phone calls, he feared for his safety, the safety of his family, and the safety of the Perez family and was still in fear during the trial. Id. at 2171.

The fact that Huber did not contact the police regarding the threat until after the firebombing of the Perez house does not alter the fact that the call itself caused Huber to experience fear and that the later firebombing increased that fear. Under California law, "threatening statement does not have to be the sole cause of the victim's fear and that a statement the victim does not initially consider a threat can later be seen that way based upon a subsequent action taken by a defendant" and thereby qualifies as "sustained fear" under California Penal Code § 422. See Solis, 90 Cal. App. 4th at 1013-14. Consistent with Solis, the state appellate court found that "[t]he duration of Huber's fear from the point at which he understood, because of [Petitioner's and his co-conspirators'] subsequent action, that the threat which had been conveyed to him was not 'all B.S.,' until he testified at trial supports the element that Huber experienced sustained fear." Adams, 2008 WL

2115357, at *17. Viewing the evidence in the light most favorable to the prosecution, it is clear that any rational trier of fact could have found that Petitioner made criminal threats within the meaning of California Penal Code § 422, *including* causing Huber reasonably to be in "sustained fear" for his safety and that of his immediate family.

Accordingly, the state appellate court's rejection of Petitioner's insufficiency of the evidence claim (relating to Huber) was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent or an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. See 28 U.S.C. § 2254(d)(1). Therefore, habeas relief on this claim is DENIED.

**3. Analysis of Claim Regarding Perez**

The state appellate court addressed this claim as follows:

> Appellant argues, "Only after a leading question by the prosecutor asking whether Perez 'was afraid,' did Gonzalez confirm that Perez 'said something that he was afraid.' Huber testified that Perez's emotional state during the encounter in his yard was "at first confusion then, you know, fear and concern." He said that Perez's wife was "a lot more emotional about it . . . . She was crying about what happened and really concerned about the woman." Gonzalez testified that Perez appeared "surprised." The prosecutor asked, "Was he afraid?" and Gonzalez answered that Perez "said something that he was afraid for his children." During deliberations, the jury asked for the testimony of the responding police officer "regarding his interview with Justin Perez." The officer had testified that Perez was next to Shante when he arrived. He said that Perez was "quiet" and that when the officer questioned him "he was not shouting or yelling or . . . outwardly hysterical; but he was, you know, shaken up, just trying to remain calm. He looked a little flushed . . . looked nervous but, again, not agitated." The officer said that Perez "spoke haltingly . . . but he was able to speak." Perez did not testify.
>
> <u>The evidence showed that at the time of the threats that Perez showed fear, that Perez said that he was afraid for his children, and that even after the police had arrived and the witnesses were being interviewed, Perez was still "shaken up." Given the deferential standard of review, we believe that on this record a rational trier of fact could find that Perez experienced fear for a period of time that extended beyond what is momentary, fleeting, or transitory</u>.

<u>Adams</u>, 2008 WL 2115357, at *16 (emphasis added).

Perez did not testify at trial; however, Huber testified to Perez's demeanor after their contact with Petitioner on August 23, 2004. Resp't Ex. B8 2148-50. Huber stated that Perez was visibly shaken up and showed fear and concern. The law enforcement officer who questioned Perez after the incident stated that Perez tried to remain calm but was visibly shaken up. Resp't Ex. B9 2490-91. This evidence supports a finding that Perez was in fear more than momentarily.[5] Construing the evidence in the light most favorable to the prosecution, it supports the conclusion that a rational trier of fact could have found that Petitioner made criminal threats within the meaning of California Penal Code § 422, including causing Perez reasonably to be in "sustained fear" for his safety and that of his immediate family.

Accordingly, the state appellate court's rejection of Petitioner's insufficiency of the evidence claim (relating to Perez) was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent or any unreasonable determination of the facts in the light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d)(1). Therefore, habeas relief as to this claim is DENIED.

**C. CERTIFICATE OF APPEALABILITY**

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability (COA) in the ruling. Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a COA. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A judge shall grant a COA "only if the applicant has made a substantial showing of the denial of a

---

[5] As noted above, the state appellate court also noted that under California law "sustained fear" has been described as "a period of time that extends beyond what is momentary, fleeting, or transitory." Adams, 2008 WL 2115357, at *13 (quoting Allen, 33 Cal. App. 4th at 1156). Consistent with Allen, the state appellate court found that the aforementioned evidence supported the element that Perez experienced "sustained fear" by concluding as follows: "Perez experienced fear for a period of time that extended beyond what is momentary, fleeting, or transitory." Id. Again, this Court is bound on federal habeas by the state appellate court's interpretation of its own laws. See Bradshaw, 546 U.S. at 76.

constitutional right." 28 U.S.C. § 2253(c)(2). The certificate must indicate which issues satisfy this standard. See id. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straight forward: the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

For the reasons set out above, jurists of reason would not find the result debatable or wrong. The Court therefore declines to issue a COA. Petitioner is advised that he may not appeal the denial of a COA, but he may ask the court of appeals to issue a COA under Rule 22 of the Federal Rules of Appellate Procedure. See Rule 11(a), Rules Governing § 2254 Cases.

## IV. CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED THAT:

1. The Petition for Writ of Habeas Corpus is DENIED as to all claims.

2. The Court declines to issue a COA. Petitioner may seek a COA from the Ninth Circuit Court of Appeals.

3. The Clerk of the Court shall enter judgment, terminate any pending motions, and close the file.

IT IS SO ORDERED.

Dated: 3/31/14

SAUNDRA BROWN ARMSTRONG
Senior United States District Judge

P:\PRO-SE\SBA\HC.10\Adams 10-5642-HC.deny.final--revisedkkf041014.docx